IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

**CV507 - 92**

| | |
|---|---|
| UNITED STATES ex rel. <br> LANA ROGERS <br><br> Plaintiff <br><br> v. <br><br> NAJAM AZMAT, M.D., <br> SATILLA HEALTH SERVICES, INC., <br> d/b/a SATILLA REGIONAL MEDICAL <br> CENTER, ROBERT TRIMM, <br> WINDELL SMITH, HARMON <br> RAULERSON, JONATHAN <br> ABBOTT, and GREGORY UHL, M.D. <br><br> Defendants | * <br> * <br> * <br> * <br> * <br> * CASE NUMBER _____ <br> * <br> * <br> * **FILED UNDER SEAL PURSUANT TO** <br> * **31 U.S.C. § 3730(b)(2)** <br> * <br> * **DO NOT PLACE IN PRESS BOX** <br> * **DO NOT ENTER ON PACER** <br> * <br> * <br> * |

## COMPLAINT UNDER THE FALSE CLAIMS ACT
## AND DEMAND FOR JURY TRIAL

COMES NOW the plaintiff in the above-styled case and states this Complaint against defendants as follows:

### Parties and Jurisdiction

1.     Lana Rogers is a resident and citizen of Ware County, Georgia. Ms. Rogers is a registered nurse who formerly worked in the Heart Center cath lab at Satilla Regional Medical Center until she was fired from her job by defendant Satilla in January, 2006.

2.     Lana Rogers has detailed, direct, individual and personal knowledge of defendants' fraudulent scheme and false claims described herein, through her employment as a nurse at Satilla Regional Medical Center's Heart Center cath lab. Lana Rogers is an "original source" of the information set forth herein regarding defendants' fraudulent scheme and false claims within the meaning of 31 U.S.C. § 3730(e)(4)(B). Lana Rogers voluntarily provided to the Government the information set forth herein regarding

defendants' fraudulent scheme and false claims, before the filing of this Complaint, as required by 31 U.S.C. § 3730(e)(4)(B).

3.    Defendant Najam Azmat is a resident and citizen of Ware County, Georgia, and is subject to the jurisdiction of this Court.

4.    Defendant Satilla Health Services, Inc. is a Georgia corporation having its principal place of business in Ware County, Georgia.  This defendant operates a public hospital in Ware County known as Satilla Regional Medical Center and this defendant is subject to the jurisdiction of this Court.

5.    Defendant Robert Trimm is a resident and citizen of Ware County, Georgia and is subject to the jurisdiction of this Court. He is the President and CEO of Satilla Health Services, Inc., d/b/a Satilla Regional Medical Center (hereinafter referred to as "Satilla").

6.    Defendant Windell Smith is a resident and citizen of Ware County, Georgia and is subject to the jurisdiction of this Court. He is the Chief Operating Officer of Satilla.

7.    Defendant Harmon Raulerson is a resident and citizen of Ware County, Georgia and is subject to the jurisdiction of this Court. He is the Administrator in overall supervision of Satilla's Heart Center.

8.    Defendant Jonathan Abbott is a resident and citizen of Ware County, Georgia and is subject to the jurisdiction of this Court. He is the Administrator in direct supervision of the cath lab at Satilla's Heart Center.

9.    Defendant Gregory Uhl, M.D. is a resident and citizen of Ware County, Georgia and is subject to the jurisdiction of this Court. He is the Medical Director of Satilla's Heart Center.

-2-

10.     All of the defendants herein conspired and combined together to knowingly defraud the Government by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(1), (2) and/or (3).

11.     The object of the conspiracy, which these defendants entered into and carried out, was to knowingly submit false claims for and obtain reimbursement from Medicare and/or Medicaid for totally worthless medical services and procedures performed by defendant Azmat and/or for medical services and procedures performed by defendant Azmat which were not medically necessary or indicated.  It was also an object of this conspiracy for defendant Satilla to submit false claims for and obtain reimbursement from Medicare and/or Medicaid by knowingly "upcoding" its technical fees/facility fees related to procedures performed by Dr. Azmat in order to overcharge for these fees and to charge for procedures which were more extensive than those actually performed by Dr. Azmat and to otherwise overcharge or double bill for services performed.

12.     It was a part of this conspiracy that these defendants would conceal complaints and otherwise obstruct and impede the detection, investigation and resolution of complaints made by hospital employees (including Lana Rogers and other nurses who worked in Satilla's Heart Center cath lab) concerning their observations and conclusions to the effect that defendant Azmat was totally incompetent to perform interventional angiography/arteriography procedures, by threats, intimidation, inaction and other conduct including the firing of Lana Rogers when she simply tried to speak out for the sake of the safety and benefit of the patients of Satilla and Azmat.

13.     The Court has personal jurisdiction over each of the defendants herein.

14.     The Court has subject matter jurisdiction over the claims asserted herein.

15.     Venue is proper in this Court.

## Facts

16.     Defendant Najam Azmat moved to Waycross, Georgia in the summer of 2005, after having been recruited by defendant Trimm on behalf of Satilla to move his medical practice from Kentucky to Waycross, Georgia.

17.     Defendant Satilla entered into an agreement with defendant Azmat wherein it guaranteed that defendant Azmat would make a certain amount of revenue if he moved his medical practice to Waycross, Georgia from Kentucky.

18.     In the summer of 2005, defendant Azmat applied for privileges to practice general surgery, thoracic surgery and vascular surgery at Satilla.

19.     Before moving to Waycross, defendant Azmat practiced at Hardin Memorial Hospital in Elizabethtown, Kentucky.

20.     Before defendant Azmat moved to Waycross, it was determined by Hardin Memorial Hospital that in twenty-three (23) percent of Dr. Azmat's cases, an intraoperative complication and/or postoperative complication had occurred.  Accordingly, the Medical Executive Committee of that hospital requested that all of Dr. Azmat's elective procedures have a second opinion obtained before the procedure could be performed.  In addition, the Medical Executive Committee required that in all major cases to be performed by Dr. Azmat, a second physician must be present to assist Dr. Azmat in the performance of the surgery.  Specifically, the Chief of Surgery compiled a list of types of procedures as to which Azmat was required to have a second physician assisting him in order to perform these surgeries.  The procedures in question are as follows:

    "-Colon Surgery
    -AAAs
    -Distal Femoral Bypass Grafts

-4-

-Thoracic Cases
-Nissan Fundoplication and/or Hiatal Hernia Repair
-Gastrectomy (Partial or Total)
-Any Bowel Surgery requiring Anastomosis
-Aortobifemoral Bypass
-Inferior Vena Cava Filters
-Carotid Endarterectomies"

21.     The Medical Executive Committee took these measures in hopes of helping Dr. Azmat decrease his morbidity and mortality rate.    These recommendations by the Medical Executive Committee were accepted by defendant Azmat and were adopted by the Medical Executive Committee and were reported as an Adverse Action Report to the National Practitioner Data Bank.  That Adverse Action Report, which is contained in the records of the National Practitioner Data Bank, specifically provides with regard to Dr. Azmat as follows:

"Due to a concerning rate of intraoperative and post operative complications and concern with appropriateness of procedures, the practitioner voluntarily agreed to comply with stipulations of obtaining a second opinion before all elective surgical cases are scheduled, and by obtaining a second assistant surgeon for vascular surgery cases and some specific major general surgical cases until further review is accomplished."

22.     When defendant Azmat applied for privileges at Satilla, Satilla obtained and reviewed the above Adverse Action Report on Dr. Azmat, which is contained in the National Practitioner Data Bank.

23.     While defendant Azmat practiced at Hardin Memorial Hospital in Elizabethtown, Kentucky, at least three civil suits were filed against Azmat for medical

malpractice in the Hardin Circuit Court, Commonwealth of Kentucky, all of which are a matter of public record.

24.     Despite this extensive adverse information on Dr. Azmat which was either specifically known by defendant Satilla or was a matter of public record and should have been discovered by Satilla, defendant Satilla granted general surgery, thoracic surgery and vascular surgery privileges to Dr. Azmat effective August 8, 2005.  Defendant Satilla also allowed Azmat to perform interventional angiography/arteriography procedures including invasive peripheral intervention procedures it its Heart Center cath lab starting in August 2005, even though he was not formally granted privileges to do those types of procedures. If defendant Azmat was actually granted privileges to perform interventional angiography/arteriography procedures in the Heart Center cath lab, then defendant Satilla granted those procedures without requesting or obtaining any proof whatsoever that Azmat possessed the requisite training, skill, or experience to safely and effectively perform such procedures.  Even a cursory review of Azmat's education, training and experience would have revealed that he lacked the training, skill, experience and competency to safely and effectively perform such procedures.

25.     Shortly after being granted privileges at Satilla, defendant Azmat began doing interventional angiography/arteriography procedures in the Heart Center cath lab at Satilla, including, but not limited to, femoral arteriograms and abdominal aortagrams.

26.     The nursing staff at the Heart Center cath lab, including Lana Rogers, immediately recognized that Dr. Azmat was incompetent to do these procedures.  The nurses in the cath lab unanimously concluded and realized from Dr. Azmat's very first case that he had no training or experience or competence to do these invasive procedures.  The

-6-

nurses concluded and realized that Dr. Azmat did not know anything about the types of catheters and wires that needed to be used in these procedures and that he did not know how to manipulate the catheters and wires and that he had very poor technique in the use of the catheters and wires.

27.    Very shortly after defendant Azmat began doing these procedures in August 2005, the nurses in the cath lab went to the administration of Satilla (specifically to defendants Uhl, Abbott, Raulerson, Smith and Trimm) with complaints that Dr. Azmat was incompetent to perform these types of procedures and that he did not know what he was doing.   Lana Rogers was one of the most vocal of the nurses making Dr. Azmat's incompetence known to Satilla and all of its administrators, including Dr. Uhl as Medical Director of the Heart Center.

28.    The nurses first expressed these concerns to defendant Raulerson and defendant Trimm.  When Lana Rogers reported to defendants Raulerson and Trimm that defendant Azmat was incompetent and did not know how to do the procedures that he was performing in the cath lab, defendant Raulerson laughed and told her "well you teach him." This statement was made by defendant Raulerson in the presence of defendant Trimm, who said nothing to contradict these instructions.

29.    The nurses in the cath lab unanimously concluded that defendant Azmat was a   danger   to   the   patients   on   whom   he   was   performing   interventional angiography/arteriography procedures, including invasive peripheral intervention procedures and that he was simply not safe to perform these procedures and that patients were going to be harmed and injured by Dr. Azmat if the hospital did not prevent him from doing these procedures.  It was out of concern for patient safety that the nurses repeatedly

-7-

made their conclusions and concerns regarding defendant Azmat's incompetence known to the hospital administrators.  The nursing staff continuously and repeatedly made their concerns and complaints known to defendants Uhl, Abbott, Raulerson, Smith and Trimm starting in late summer of 2005 and continuing thereafter.  Several of the nurses on the nursing staff at the Heart Center cath lab explicitly told defendants Uhl, Abbott, Raulerson, Smith and Trimm that defendant Azmat was definitely going to "kill someone" if the hospital continued to let him perform invasive procedures in the cath lab, which he clearly had no competence to perform.  All of these warnings, statements and concerns voiced by the nurses were completely and totally ignored by defendants Uhl, Abbott, Raulerson, Smith, Trimm and Satilla.

30.    From the outset, defendant Azmat had a high complication rate in the interventional angiography/arteriography procedures that he performed in the Heart Center cath lab at Satilla, including multiple dissections of arteries in the extremities  and a  dissected aorta.  In addition, most, if not all, of these procedures that defendant Azmat performed in the cath lab were not medically necessary or indicated.

31.    After Dr. Azmat was granted privileges effective August 8, 2005 and began performing surgeries in the operating room at Satilla, it became apparent almost immediately that Azmat had a very high intraoperative complication rate and also a very high post-operative complication rate and that these complication rates for Azmat's surgeries at Satilla were at least as high as those which he experienced at Hardin Memorial Hospital in Kentucky.  By way of example, in one of the very first surgeries that Azmat performed at Satilla, Azmat performed surgery on a patient in order to remove the patient's gall bladder only to discover after he opened the patient up that the patient's gall bladder

-8-

had already been removed some years before. In addition, Mary Ruth Vines suffered serious complications as a result of Azmat's negligence in the performance of an unnecessary carotid endarterectomy procedure in October 2005, during which Azmat negligently severed nerves in Mrs. Vines' neck and was otherwise negligent. Norman Copeland, Allan Flower, Betty Smith and Ronald Sharpe suffered extremely serious and life-threatening complications as a result of open procedures negligently performed by Dr. Azmat in October 2005, December 2005,  September 2006, and December, 2006, respectively. In addition to having a high complication rate, most of the open procedures that Azmat performed were not medically necessary and/or were contraindicated.

32.    Despite the repeated, continuous and explicit warnings and complaints of Dr. Azmat's incompetence, which defendant Satilla had received from its own nursing staff in its Heart Center cath lab and despite Azmat's high intraoperative and post-operative complication rate, in late August 2005, defendant Satilla began running advertisements in the Waycross Journal-Herald promoting Dr. Azmat and touting his expertise as a vascular surgeon. These advertisements were paid for by Satilla and the advertisements represented to the public that defendant Azmat was a reputable and competent vascular surgeon. These advertisements stated specifically that "Dr. Azmat keeps things running smoothly. For example, your blood." Defendant Satilla began running these ads in late August 2005 and continued to run them for several months. Before the first advertisement appeared, defendant Satilla and its administrators had been specifically and explicitly warned by the nursing staff at the Heart Center cath lab that defendant Azmat was incompetent.

33.    Despite the repeated, continuous and explicit warnings of defendant Azmat's incompetence received from Satilla's own nursing staff, in the fall of 2005 defendants

-9-

Satilla, Uhl, Abbott, Raulerson, Smith and Trimm allowed defendant Azmat to begin doing even more complicated interventional angiography/arteriography procedures in the cath lab, including stent procedures. All of the nurses in the nursing staff at the Heart Center cath lab immediately concluded that defendant Azmat was incompetent to perform these procedures. Defendant Azmat had a very high percentage of complications doing these procedures, including multiple dissected arteries, and most, if not all, of these stent procedures were not medically necessary or indicated.

34. Toward the end of December 2005, defendant Azmat attempted to perform a renal stent procedure on a patient and during the course of this procedure, due to Azmat's complete and total incompetence and due to the fact that Azmat lacked the requisite training, skill and experience to safely and effectively perform such a procedure, Azmat perforated the patient's renal artery, causing internal bleeding and causing the patient to die as he was being transferred via ambulance to a larger hospital in Jacksonville, Florida. Furthermore, this renal stent procedure that was performed by Dr. Azmat on this patient was not medically necessary or indicated in any way, as this patient had only minimal stenosis and absolutely did not require a renal stent procedure in the first place. Lana Rogers knows the name of this patient and will reveal the patient's name upon appropriate court order or other circumstances permitted under HIPPA.

35. On December 29, 2005, defendant Azmat was attempting to perform an interventional angiography/arteriography procedure on a patient by the name of Judith Gary when he badly and grossly dissected Mrs. Gary's aorta and/or right common iliac artery as a result of his complete and total incompetence in the performance of such procedures. These procedures are performed under fluoroscope and all of the nurses who

-10-

were involved in this procedure could easily see that Azmat had dissected Mrs. Gary's arteries and yet Azmat was oblivious to this fact and did not even realize that he had dissected the patient's arteries and he continued with the insertion of a catheter into the dissection, further widening the dissection. Nurse Evan Gourley was so disgusted with this situation that during this procedure, he took off his lead apron and threw it down and refused to have any further involvement with this procedure or with Dr. Azmat and he left the procedure room at that time.

36.    Shortly after this renal artery perforation and aortic dissection occurred at the end of December 2005, all of the nurses in the Heart Center cath lab met with defendants Uhl, Abbott and Raulerson and told those defendants that they did not want to work with Dr. Azmat any more because of their very serious concerns about patient safety and about Dr. Azmat's incompetence.

37.    Following this meeting, defendants Uhl, Abbott and Raulerson represented to the nursing staff of the Heart Center cath lab that Dr. Azmat had voluntarily agreed to only do "low risk" arteriograms and that he would no longer be doing stent procedures. It was represented to the nursing staff that Dr. Uhl would be supervising Dr. Azmat when Dr. Azmat did any further cases in the cath lab. It was further represented to the nurses that Dr. Azmat would be provided with training in the types of procedures that he had been allowed to perform. The nursing staff was informed that if they refused to work with defendant Azmat, they would lose their jobs in the cath lab but that "if they could see past their conscience to stay and work with Azmat" they could keep their jobs. This prompted several of the nurses to meet with Satilla's in-house attorney, Scott Crowley, to make sure that their licenses would not be jeopardized and that they (i.e., the nurses) would be covered

-11-

by Satilla's insurance if they were sued by a patient who was injured by defendant Azmat. Satilla's in-house attorney, Scott Crowley, told the nurses that they would be covered by the hospital's insurance and that their RN licenses were safe. However, defendant Satilla, took no action regarding defendant Azmat's incompetence or regarding defendant Azmat's medical staff privileges.

38.     While Satilla's administrators represented to the nurses in the cath lab at the end of December 2005 that Dr. Uhl would be supervising Dr. Azmat whenever he did any further interventional cases in the cath lab, in fact Dr. Uhl himself was not competent to perform interventional angiography/arteriography procedures and he was certainly not competent to perform stent procedures, including renal stent procedures. In fact, Uhl had no medical staff privileges at Satilla to perform any such procedures and he lacked the requisite training, skill and experience to safely and effectively perform renal stent procedures or other interventional angiography/arteriography procedures. Defendant Uhl had absolutely no formal training of any kind in the performance of renal stent procedures. Nevertheless, he was the physician who the nurses were told was being put in charge of "supervising" Dr. Azmat in the performance of these procedures and assisting Dr. Azmat in the performance of these procedures.

39.     On January 12, 2006, Dr. Azmat was once again scheduled to do a renal stent procedure even though it had been represented to the nursing staff approximately ten days prior thereto that he would no longer be doing any such procedures until he was trained to do so. When the nurses in the Heart Center cath lab questioned defendants Abbott and Raulerson about defendant Azmat being allowed to schedule this stent procedure, defendant Raulerson stated that "powers higher than his within the Heart Center" (i.e.,

-12-

defendants Smith and Trimm), stated that defendant Azmat had full credentials and privileges to do these stent procedures and he would be allowed to do so.

40.    During the course of the January 12, 2006 renal stent procedure, three of the nurses involved with the procedure, Lana Rogers, Eric Herrin, and Rebecca Willyoung, asked whether the wire that Dr. Azmat was manipulating was properly placed. Lana Rogers asked this question in a conversational tone and she was not disruptive in any way. She questioned the wire placement as a part of her responsibility as a nurse, and out of concern for the patient's safety, as did nurses Herrin and Willyoung. Lana Rogers knew that Azmat had negligently perforated the renal artery of his last renal stent patient just a few weeks earlier, resulting in the death of that patient. Lana Rogers was fired from her job by defendant Satilla that same day for questioning Dr. Azmat's placement of the wire during this renal stent procedure, even though she was only one of three nurses who raised the same question. Lana Rogers is an excellent nurse who worked at Satilla at two separate times. She worked at Satilla from December 30, 1996 until February 25, 2000 when she resigned to take another nursing job, and she most recently worked at Satilla in the Heart Center cath lab from June 24, 2002 until she was fired on January 12, 2006. Lana Rogers always received very favorable performance evaluations from her supervisors at Satilla until she was fired on January 12, 2006 for questioning Dr. Azmat's placement of a guide wire during a renal stent procedure.

41.    On January 19, 2006, defendant Azmat attempted to perform yet another renal stent procedure on a patient by the name of Ruth Minter. Because of Azmat's complete and total incompetence and lack of any training, skill or experience in the performance of such procedures, defendant Azmat once again perforated the patient's renal

-13-

artery, causing her to bleed out and eventually die. Once again, during this procedure, defendant Azmat was so incompetent that he did not even recognize that he had perforated Mrs. Minter's renal artery and he failed to take appropriate actions to rectify the renal artery perforation and failed to effectuate a timely transfer of Mrs. Minter after she had suffered this renal artery perforation. Azmat eventually abandoned this patient following this procedure and simply went to the operating room to perform another case, leaving Mrs. Minter in the recovery room suffering from extremely serious and life-threatening complications as a result of his own incompetence and negligence. Defendant Azmat completed his renal stent procedure by approximately 2:00 p.m. on January 19, 2006 but Mrs. Minter was not transferred until 9:33 p.m. when she was finally life-flighted to Baptist Medical Center where she eventually died as a result of Azmat's renal artery perforation.

42.    Under Satilla's medical staff bylaws, defendants Trimm and Satilla had the power and the right to limit or suspend all or any part of defendant Azmat's privileges pending an investigation of the nurses' concerns for patient safety and of the complications suffered by defendant Azmat's patients and of Azmat's high complication rate. Defendant Smith specifically acknowledged this fact to various nurses in the Heart Center cath lab, but further stated that Satilla would not take such action because they did not want to harm Dr. Azmat's reputation and because they believed that such action would not be upheld if Dr. Azmat appealed such action. Defendants Trimm and Satilla certainly had the complete power and right to disallow defendant Azmat from doing any interventional procedures in the Heart Center cath lab as to which he had not been granted privileges to perform in the first place.

43.     Defendant Uhl specifically stated to numerous nurses on the nursing staff at the Heart Center cath lab that he was fully aware that Dr. Azmat either had minimal training or no training at all in the procedures that he was performing at the Satilla cath lab but that there was nothing that could be done because none of Dr. Azmat's patients had lost a life or limb yet.  These statements were made by defendant Uhl to the nurses in the presence of defendants Raulerson and Abbott.  Defendant Uhl stated that technically there had not been any complications because no one had lost their life or limb yet.

44.     On one of the occasions when nurse Evan Gourley went to defendant Windell Smith to complain about Azmat's incompetence in the cath lab, Gourley asked Windell Smith if somebody was going to have to die in the cath lab for Smith or the hospital administration to do something to stop Dr. Azmat.  Defendant Windell Smith's response to that question was in the affirmative.  Smith specifically told nurse Gourley in response to his question that this is in fact what was going to have to happen in order for anything to be done.

45.     Dr. Uhl stated on numerous occasions that the hospital's decision to allow Dr. Azmat to use the Heart Center cath lab for these procedures was considered by Dr. Uhl and by the hospital administration to be related in some way to the hospital's ongoing dispute with several other cardiologists and that Dr. Azmat's use of the cath lab was considered to be "progress" that was being made by Satilla in the cath lab in relation to the hospital's ongoing dispute with these cardiologists.

46.     The dispute referenced by Dr. Uhl concerned the administration's decision, and specifically the decision of Trimm, to unlawfully attempt termination of twelve (12) cardiologists' medical staff privileges.  It was determined by the Ware County Superior

-15-

Court that this decision was unlawful and was motivated by retaliation after failed contract negotiations. All of the cardiologists were eventually reinstated to the hospital by Court Order after lengthy and costly litigation. Defendant Trimm's ill-conceived and unlawful termination of these cardiologists' medical staff privileges cost the hospital an enormous amount of money in legal fees and further was an embarrassment and public relations fiasco which resulted in a sharp decline in hospital revenue.

47.     In fact, as a result of defendant Satilla's ongoing dispute with these cardiologists in the year 2005, defendant Satilla experienced a thirty-five percent (35%) or greater reduction in revenue from the Heart Center compared to the previous year. Satilla attempted to recoup some of this shortfall by allowing defendant Azmat to perform procedures in the Heart Center cath lab, even though he was not competent to perform those procedures. Defendant Satilla charged very high technical fees for the procedures that defendant Azmat was performing.

48.     In November 2005, defendant Smith came to the Heart Center cath lab and met with all of the nurses in the Heart Center cath lab, along with defendant Raulerson. During this meeting, defendant Smith showed the nurses in the cath lab some documents demonstrating that the Heart Center at Satilla Regional Medical Center had experienced a very severe decrease in revenue in 2005 as compared to the 2004 revenue of the Heart Center. Defendant Smith specifically referred to the fact that the Heart Center had experienced this very substantial drop in revenue from the year before due to the fact that Doctors Bell and Ferree, two of the cardiologists referenced in Paragraph 46, had opened up their office outside of the hospital on Alice Street in Waycross.

49.    Satilla was definitely using Dr. Azmat's performance of procedures in the cath lab to try to make up this shortfall in revenue.   When Azmat started doing interventional angiography/arteriography procedures in the Heart Center cath lab, one of the hospital administrators, defendant Jonathan Abbott, personally did all of the coding for Azmat's procedures so that Satilla could capture as much income as possible from these procedures. This was a definite departure from normal billing procedures, as the nurses themselves usually would do the coding for cath lab procedures.   When questioned why the billing procedure had been changed for procedures performed by Dr. Azmat, Jonathan Abbott stated that he was doing the coding because "so much money" was involved for the hospital as a result of these procedures being done by Azmat in the Heart Center cath lab. Furthermore, defendant Abbott routinely and knowingly "upcoded" the hospital's technical/facility fees related to defendant Azmat's procedures in the cath lab by coding for services or procedures which were more extensive than those actually performed by defendant Azmat. This "upcoding" was done with the full knowledge of defendants Satilla, Trimm, Smith, Raulerson and Uhl, as a part of the knowing conspiracy entered into by all defendants herein.   As a specific example, when defendant Azmat performed a carotid arteriogram, defendant Abbott would code additional charges for seeing the contrast running through the venous outflow, even though this had nothing to do with the carotid study that was performed, for which there is an established code and charge.   Lana Rogers has firsthand personal knowledge of this conduct.

50.    Defendant Satilla entered into a revenue guaranty agreement with defendant Azmat in order to entice defendant Azmat to move to Waycross.  Thus, the more cases that

-17-

defendant Azmat performed, the less chance there was that defendant Satilla would have to pay anything to defendant Azmat under its revenue guaranty agreement.

51.   On or about October 31, 2005 (about two and one-half months after moving to Waycross and being granted privileges at Satilla), defendant Azmat filed a Chapter 7 Petition for Bankruptcy in the United States Bankruptcy Court for the Western District of Kentucky in which he sought to discharge over $425,000.00 in unsecured debt owed to various creditors, including credit card companies.  At all times during which defendant Azmat was performing interventional angiography/arteriography procedures in Satilla's Heart Center cath lab, defendant Azmat was deeply in debt and he was performing as many procedures as possible in the cath lab whether the procedures were medically indicated or not, and despite the fact that Azmat was well aware that he was not trained or competent to perform such procedures.

52.   In order for defendants to carry out their fraudulent scheme described herein, it was imperative that the physician who was the Medical Director of Satilla's Heart Center be willing to go along with the fraudulent scheme and defendant Uhl was entirely complicit in the fraudulent scheme and knowingly combined and conspired with the other defendants to carry out the fraudulent scheme described herein.

53.   Defendant Uhl was granted medical staff privileges at Satilla Regional Medical Center at the same time that defendant Azmat was granted privileges in August 2005, despite the fact that the Uhl had a very checkered and troubling and unsavory past. Nevertheless, Uhl was granted privileges and immediately made Medical Director of Satilla's Heart Center.

-18-

54.    While practicing in the State of New Mexico, Dr. Uhl had been accused of being an "impaired physician" by the State of New Mexico in 2003 by reason of either (a) repeated use of mind-altering substances or controlled substances and/or alcohol; or (b) his past disruptive behavior and anger management violations directed at both nurses and patients. According to the public records on file with the New Mexico State Medical Board, instead of undergoing mental and physical testing for his condition, and entering into a State-approved impaired physician treatment program, Dr. Uhl surrendered and forfeited his license to practice medicine in New Mexico on July 9, 2003. As required by federal law, the New Mexico Medical Board reported these "red flag" warnings to the National Practitioner Data Bank (Data Bank) to alert hospitals such as Satilla that Dr. Uhl had serious competency and safety issues. Under the federal law, this Data Bank information is designed to be used by hospitals such as Satilla to protect patients such as Mrs. Minter from incompetent and dangerous doctors.

55.    After forfeiting and surrendering his license to practice medicine in New Mexico, Dr. Uhl moved to Carrolton, Georgia, and was employed as a staff physician for Cardiologists Specialists of West Georgia. While in Carrolton, he applied for and was granted provisional hospital staff privileges at the Tanner Medical Center (Tanner). Thereafter and in the spring of 2004, Dr. Uhl had his hospital staff privileges at Tanner summarily revoked and was fired from his job as a staff physician with Cardiologists Specialists of West Georgia as a consequence of lying on his application for hospital privileges at Tanner. According to the public records, Dr. Uhl had intentionally concealed from Tanner the fact that he had been reported to the Data Bank by the New Mexico Medical Board for his impairments and loss of his license. After Tanner's investigation

revealed that, indeed, Dr. Uhl had surrendered his license and that this fact had been reported to the Data Bank, Dr. Uhl resigned his Tanner staff privileges instead of undergoing a hospital committee review and hearing. As they should have under federal law, Tanner reported to the Data Bank that Dr. Uhl resigned in the midst of this investigation. Tanner's report to the Data Bank was an additional "red flag" warning to all hospitals, including Satilla that Dr. Uhl was a competency and safety concern for patients such as Mrs. Minter.

56.   After leaving Carrolton, Dr. Uhl moved to Valdosta, Georgia and sought hospital privileges at the community hospital, known as South Georgia Medical Center (SGMC). Upon information and belief, once the governing authority at SGMC discovered that Dr. Uhl had been reported to the Data Bank and was associated with the above-referenced impairments and competency "red flags", they properly declined to grant him staff privileges.

57.   Plaintiff shows that additional serious "red flags" about Dr. Uhl's competency surfaced during 2004 and 2005. Between April and June of 2004, Dr. Uhl underwent treatment at a psychiatric facility known as Ridgeview Institute in Smyrna, Georgia. According to the public records, in October of 2004, **after** completing a course of psychiatric treatment at Ridgeview, Dr. Uhl acknowledged and admitted in a signed statement, given under penalties of perjury, that he still had a medical or mental condition that impaired or limited his ability to safely practice medicine. The question asked on the application was: **"Do you have any medical or mental condition that in any way impairs or limits your ability to safely practice medicine?"** In response to this question, Dr. Uhl checked the box **"YES"**. This was a clear and ominous "red flag" warning of his lack of competence.

58.     Plaintiff shows that other "red flags" existed. Shortly before coming to Waycross in June of 2005, the New Mexico Medical Board agreed to reinstate Dr. Uhl's license on a probationary status if Dr. Uhl met certain stringent conditions. In a "Stipulation of License" filed in the public records on June 6,2005, two months before his privileges were granted at Satilla, the New Mexico Medical Board mandated that if Dr. Uhl returned to New Mexico, he would be required to:

> (i)     be monitored at all times by the New Mexico Monitored Treatment Program;
>
> (ii)    continue with mental health care provided through a private consent order approved by the **Georgia** Medical Board, with quarterly reports of his progress to be issued to the New Mexico Board;
>
> (iii)   restrict his practice to a setting where he would be required to have a workplace physician monitor who could report all incidents involving disruptive behavior; and
>
> (iv)    submit to random body fluid testing as well as meet all requirements of the impaired physician treatment laws.

Once again, instead of meeting these restrictive conditions, Dr. Uhl applied for privileges at Satilla.

59.     Plaintiff shows that on August 8,2005, despite all of the above matters of public record, Satilla granted Dr. Uhl unrestricted cardiology privileges and incredibly appointed him as the Medical Director of the Heart Center. Dr. Uhl's own statement, that he was unable to practice medicine safely, was ignored by Trimm and Satilla when they granted him unrestricted hospital privileges. Likewise, Dr. Uhl's background and lack of

ability to safely practice medicine and lack of training and privileges in interventional cath lab procedures was ignored by Trimm and Satilla when they directed Dr. Uhl to assist, instruct and supervise Dr. Azmat in performing cath lab procedures.  Dr. Uhl, Medical Director of the Heart Center, was from the outset a necessary and willing and knowing participant in the fraudulent scheme described herein.

### False Claims and Specific Examples

60.    The defendants were all fully aware very shortly after Dr. Azmat began performing interventional angiography/arteriography procedures in Satilla's Heart Center cath lab in August 2005 that all services performed by Dr. Azmat in the performance of interventional angiography/arteriography procedures in Satilla's Heart Center cath lab were totally worthless services because Azmat was so fundamentally incompetent to perform such services and procedures and because he so clearly lacked the requisite training, skill and experience to competently and safely and effectively perform such services and procedures.   Nevertheless, defendants knowingly combined and conspired together to defraud the Government by causing false claims to be presented to the Government for Satilla's technical fees and Azmat's professional fees in the form of claims for Medicare and/or Medicaid reimbursement for services and procedures performed by Azmat in the Heart  Center cath lab, which all defendants knew to be worthless.

61.    Furthermore, most, if not all, of the interventional angiography/arteriography services and procedures performed by Dr. Azmat at Satilla's Heart Center cath lab were not medically necessary or indicated and this fact was well known to defendants herein.  Similarly, most, if not all, of the open procedures performed by Dr. Azmat in Satilla's operating room were not medically necessary or indicated and this fact was well known to

defendants herein.  To the contrary, the vast majority of the services and procedures performed by Dr. Azmat in Satilla's Heart Center cath lab from August 2005, through and including January 19, 2006 and in Satilla's operating room from August 2005 through August 2007,  were not medically indicated and necessary.

62.    Nevertheless, defendants Satilla and Azmat submitted claims for Medicare/Medicaid reimbursement for their technical and professional fees for these services and in doing so, these defendants submitted HCFA-1500 forms falsely certifying that these services and procedures were medically necessary and indicated for the health of the patient or defendants otherwise falsely certified that these services and procedures were medically necessary and indicated for the health of the patient.  All defendants knowingly combined and conspired together to defraud the Government by causing these false claims to be submitted to the Government and paid.

63.    The overriding reason for the performance by Dr. Azmat of interventional angiography/arteriography services and procedures in Satilla's Heart Center cath lab from August 2005 through January 19, 2006 and in Satilla's operating room from August 2005 through August 2007 was so that Satilla and Azmat could profit by charging technical and professional fees to Medicare/Medicaid for these services and procedures which were not medically indicated and necessary and which in fact were worthless.

64.    On or about October 12, 2005, defendant Azmat negligently performed an extensive carotid endarterectomy procedure upon Mary Ruth Vines in Satilla's operating room.    This procedure was not medically necessary or indicated for Mrs. Vines. Furthermore, due to defendant Azmat's incompetence in the performance of such procedures and due to his lack of the requisite training, skill and experience to safely and

-23-

effectively perform such procedures, Azmat's services in the performance of this procedure were worthless and this was known by all defendants herein prior to the performance of this procedure. Sometime shortly after October 12, 2005, defendants knowingly combined and conspired together to cause false claims to be submitted to the Government in the form of claims for Medicare and/or Medicaid reimbursement for Azmat's professional fees and Satilla's technical fees in relation to the October 12, 2005 surgical procedure performed by Azmat on Mary Ruth Vines, which services were known by defendants to be completely worthless.

65.     These claims for reimbursement related to the services performed by Dr. Azmat during the October 12, 2005 procedure constitute false claims because Azmat's services were completely worthless, and defendants knew this before the claims were submitted.  These claims for reimbursement also constitute false claims because the procedure in question was not medically necessary or indicated for the well-being of the patient and in fact, the procedure was performed solely for the purpose of generating profit for Satilla and Azmat, contrary to the Certification made by Satilla and Azmat contemporaneous with the submission of the claim for Medicare and/or Medicaid reimbursement to the effect that the surgical procedure of October 12, 2005 was medically necessary and indicated for Mrs. Vines.

66.     On or about November 21, 2005, defendant Azmat negligently performed a cut down stent placement surgical procedure upon Norman W. Copeland in the operating room. This procedure was not medically necessary or indicated for Mr. Copeland. Furthermore, due to defendant Azmat's incompetence in the performance of such procedures and due to his lack of the requisite training, skill and experience to safely and

-24-

effectively perform such procedures, Azmat's services in the performance of this procedure were worthless and this was known by all defendants herein prior to the performance of this procedure. Sometime shortly after November 21, 2005, defendants knowingly combined and conspired together to cause false claims to be submitted to the Government in the form of claims for Medicare and/or Medicaid reimbursement for Azmat's professional fees and Satilla's technical fees in relation to the November 21, 2005 surgical procedure performed by Azmat on Norman W. Copeland, which services were known by defendants to be completely worthless.

67.    These claims for reimbursement related to the services performed by Dr. Azmat during the November 21, 2005 procedure constitute false claims because Azmat's services were completely worthless, and defendants knew this before the claims were submitted. These claims for reimbursement also constitute false claims because the procedure in question was not medically necessary or indicated for the well-being of the patient and in fact, the procedure was performed solely for the purpose of generating profit for Satilla and Azmat, contrary to the Certification made by Satilla and Azmat contemporaneous with the submission of the claim for Medicare and/or Medicaid reimbursement to the effect that the surgical procedure of November 21, 2005 was medically necessary and indicated for Mr. Copeland.

68.    On or about November 17, 2005, defendant Azmat negligently performed a right iliac angioplasty with stent placement cath lab procedure upon Allan G. Flower in Satilla's Heart Center cath lab. This procedure was not medically necessary or indicated for Mr. Flower. Furthermore, due to defendant Azmat's incompetence in the performance of such procedures and due to his lack of the requisite training, skill and experience to safely

and effectively perform such procedures, Azmat's services in the performance of this procedure were worthless and this was known by all defendants herein prior to the performance of this procedure. Sometime shortly after November 17, 2005, defendants knowingly combined and conspired together to cause false claims to be submitted to the Government in the form of claims for Medicare and/or Medicaid reimbursement for Azmat's professional fees and Satilla's technical fees in relation to the November 17, 2005 cath lab procedure performed by Azmat on Allan G. Flower, which services were known by defendants to be completely worthless.

69.    These claims for reimbursement related to the services performed by Dr. Azmat during the November 17, 2005 procedure constitute false claims because Azmat's services were completely worthless, and defendants knew this before the claims were submitted. These claims for reimbursement also constitute false claims because the procedure in question was not medically necessary or indicated for the well-being of the patient and in fact, the procedure was performed solely for the purpose of generating profit for Satilla and Azmat, contrary to the Certification made by Satilla and Azmat contemporaneous with the submission of the claim for Medicare and/or Medicaid reimbursement to the effect that the cath lab procedure of November 17, 2005 was medically necessary and indicated for Mr. Flower.

70.    In late December 2005, defendant Azmat negligently performed a renal stent procedure on the patient referred to in Paragraph 34 of this Complaint in Satilla's Heart Center cath lab. The procedure was not medically necessary or indicated for the patient. Furthermore, due to defendant Azmat's incompetence in the performance of such procedures and due to his lack of the requisite training, skill and experience to safely and

effectively perform such procedures, Azmat's services in the performance of this procedure were worthless and this was known by all defendants herein prior to the performance of this procedure. Some time shortly after this procedure was performed in late December 2005, defendants knowingly combined and conspired together to cause false claims to be submitted to the Government in the form of claims for Medicare and/or Medicaid reimbursement for Azmat's professional fees and Satilla's technical fees in relation to this late December 2005 renal stent procedure performed by defendant Azmat in Satilla's Heart Center cath lab, which services were known by defendants to be completely worthless.

71.     These claims for reimbursement related to the services performed by Dr. Azmat during the late December 2005 renal stent procedure, referred to in the previous paragraph of this Complaint, constitute false claims because Azmat's services were completely worthless and defendants knew this before the claims were submitted. These claims for reimbursement also constitute false claims because the procedure in question was not medically necessary or indicated for the well-being of the patient and, in fact, the procedure was performed solely for the purpose of generating profit for Satilla and Azmat, contrary to the certification made by Satilla and Azmat contemporaneous with the submission of the claim for Medicare and/or Medicaid reimbursement to the effect that this renal stent procedure of late December 2005 was medically necessary and indicated for this patient.

72.     In addition to the foregoing, <u>all</u> of the interventional angiography/arteriography services and procedures performed by defendant Azmat at Satilla's Heart Center cath lab from August 2005 through and including January 19, 2006 were completely worthless procedures because Azmat was so fundamentally incompetent

-27-

to perform such services and procedures and because he so clearly lacked the requisite training, skill and experience to competently and safely and effectively perform such procedures. All defendants were fully aware of the worthless nature of these services and procedures and knowingly combined and conspired together to submit false claims to the Government in the form of Medicare and/or Medicaid reimbursement claims for Azmat's professional fees and Satilla's technical fees for all of these cath lab procedures. In addition, defendant Satilla "upcoded" its technical/facility fees for these procedures by coding for services or procedures more extensive than those actually performed by defendant Azmat.

73.    By way of example and in addition to the foregoing procedures described in Paragraphs 64 through 71 of this Complaint, the defendants knowingly combined and conspired together to cause false claims to be submitted to the Government in the form of Medicare/Medicaid reimbursement claims for the following interventional angiography/arteriography procedures performed by defendant Azmat, and these false claims were submitted shortly after the dates of the procedures set forth below:

      a.    Cath lab procedure performed by defendant Azmat on Mary Ruth Vines on October 5, 2005;

      b.    Cath lab procedures performed by defendant Azmat on Norman W. Copeland on October 21, 2005, November 2, 2005 and November 17, 2005;

      c.    Cath lab procedures performed by defendant Azmat on Allan G. Flower on October 31, 2005;

      d.    Cath lab procedures performed by defendant Azmat on Judith Gary on December 15, 2005 and December 29, 2005; and

-28-

      e.     A renal stent cath lab procedure performed by
defendant Azmat on Ruth Minter on January 19,
2006.

74.    Shortly after the date of each procedure set forth in the preceding paragraph,
defendants knowingly combined and conspired together to cause false claims to be
submitted to the Government in the form of claims for Medicare and/or Medicaid
reimbursement for Azmat's professional fees and Satilla's technical fees in relation to the
procedures when defendants all knew full well, prior to the submission of these claims for
reimbursement, that the services and procedures in question were completely worthless
and/or were not medically necessary, contrary to defendants' certification, and/or were not
nearly as extensive as the procedures which Satilla's "upcoding" claimed were performed.

75.    Attached hereto as Exhibit "A" are documents demonstrating that, in fact, the
defendants submitted false claims for Medicare and/or Medicaid reimbursement for the
services and procedures of Dr. Azmat and Satilla performed on Norman W. Copeland, as
described in this Complaint, and that Medicare and/or Medicaid paid for all or a portion
of the false claims submitted, as a result of the defendants' knowing combination and
conspiracy to defraud the Government.

76.    Attached hereto as Exhibit "B" are documents demonstrating that, in fact, the
defendants submitted false claims for Medicare and/or Medicaid reimbursement for the
services and procedures of Dr. Azmat and Satilla performed on Allan G. Flower, as
described in this Complaint, and that Medicare and/or Medicaid paid for all or a portion
of the false claims submitted, as a result of the defendants' knowing combination and
conspiracy to defraud the Government.

77.     Attached hereto as Exhibit "C" are documents demonstrating that, in fact, the defendants submitted false claims for Medicare and/or Medicaid reimbursement for the services and procedures of Dr. Azmat and Satilla performed on Ruth Minter, as described in this Complaint, and that Medicare and/or Medicaid paid for all or a portion of the false claims submitted, as a result of the defendants' knowing combination and conspiracy to defraud the Government.

78.     Attached hereto as Exhibit "D" are documents demonstrating that, in fact, the defendants submitted false claims for Medicare and/or Medicaid reimbursement for the services and procedures of Dr. Azmat and Satilla performed on Betty L. Smith, as described in this Complaint, and that Medicare and/or Medicaid paid for all or a portion of the false claims submitted, as a result of the defendants' knowing combination and conspiracy to defraud the Government.

79.     Attached hereto as Exhibit "E" is a billing summary setting forth specific facts regarding false claims which defendants caused to be submitted to Medicare and/or Medicaid and which were, in fact, paid by Medicare and/or Medicaid, which facts are gleaned from Exhibits A through D.

WHEREFORE, having set forth her Complaint under the False Claims Act, plaintiff prays:

(a)     For a trial by jury in this matter;

(b)     For recovery of the full amount of all false claims submitted to and paid by or on behalf of the Government;

(c)     Treble damages as provided by law;

(d)     Penalties of $10,000.00 per claim;

-30-

(e)     Attorney's fees; and

(f)     For such other and further relief as the Court deems appropriate.

RESPECTFULLY SUBMITTED this /3 day of _Novanber_, 2007.

JOHN R. FERRELLE,
ATTORNEY AT LAW, P.C.

BY: _____

John R. Ferrelle
Georgia Bar Number 259225

Post Office Box 1601
Brunswick, GA 31521
(912) 264-0209

BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP

BY: _____

John E. Bumgartner
Georgia Bar Number 094600

Post Office Box 220
Brunswick, GA 31521-0220
(912) 264-8544

ATTORNEYS FOR RELATOR

-31-